# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

|  |  |
|---|---|
| In re: | Chapter 7 |
|  | Case No. 09-40467-MSH |
| NEIL TARDUGNO AND BONNIE TARDUGNO |  |
| Debtors |  |
| BIRCH HOLLOW, LLC |  |
| Plaintiff | Adversary Proceeding |
|  | No. 09-4097 |
| v. |  |
| NEIL TARDUGNO |  |
| Defendant |  |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

In this adversary proceeding, the plaintiff, Birch Hollow, LLC ("BH"), seeks a judgment that its claim against Neil Tardugno, the defendant here and the debtor in the main case, be excluded from Mr. Tardugno's discharge pursuant to Bankruptcy Code § 523(a)(2), (4) and (6). After a trial on January 8, 2014, review of the evidence, the record and all post-trial submissions, I now present my findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052 and enter an order for judgment in favor of Mr. Tardugno.

### Jurisdiction and Authority

The Bankruptcy Court has jurisdiction over this proceeding by virtue of 28 U.S.C. § 1334 and the order of reference in Rule 201 of the Local Rules of the United States District Court for

1

the District of Massachusetts. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) in which the Court may enter a final order.

## Findings of Fact and Procedural History

Mr. Tardugno, who has more than thirty years of experience in the automobile sales industry, was at the time of his bankruptcy petition the president and treasurer of Middleton Auto Sales, Inc. ("MAS"), a used car dealership originally located in Middleton, Massachusetts. At least as early as 2005, in order to purchase its inventory of used cars, MAS obtained automobile floor plan financing from BH.[1] The loans were structured so that both MAS and Mr. Tardugno individually were borrowers. Mr. Tardugno also personally guaranteed all loans. MAS' loan obligations were secured by its assets including its automobile inventory. The loan documents required, among other things, that MAS had to repay BH the amount borrowed to purchase a motor vehicle within 60 days of BH's lending MAS the money to make the purchase. In other words, MAS had 60 days to sell any car the purchase of which was financed through BH's floor plan arrangement. This requirement was never enforced by BH.

Gary Lowe, who was selected and paid by BH, served as escrow agent under a series of escrow agreements among BH, Mr. Lowe and MAS. Under the agreements Mr. Lowe agreed to hold in escrow the titles to all MAS automobiles financed by BH and to release a title to MAS

---

[1] "Floor plan financing is a revolving line of credit that allows the borrower to obtain financing for retail goods. These loans are made against a specific piece of collateral (i.e. an auto, RV, manufactured home, etc.). When each piece of collateral is sold by the dealer, the loan advance against that piece of collateral is repaid. In short, Dealer Floor Plan financing allows dealers to borrow against retail inventory. The dealer then repays that debt as they (sic) sell their inventory and borrows against the line of credit to add new inventory."  http://www.sba.gov/content/what-floor-plan-financing. Last visited March 31, 2014.

2

only upon MAS' delivery to him of payment in full for the vehicle plus applicable fees in accordance with the terms of the loan documents. There were no exceptions to this procedure provided for in the escrow agreements.

Charles Gaudet, who managed the day-to-day operations of BH,[2] had been acquainted with Mr. Lowe prior to designating him as the escrow agent in connection with the MAS loans. He testified at trial that Mr. Tardugno had no prior relationship with Mr. Lowe. According to the transcript of Mr. Tardugno's deposition, taken in connection with state court litigation commenced by BH against Mr. Tardugno and others and admitted into evidence at trial by agreement of the parties,[3] Mr. Tardugno believed that Mr. Lowe was an agent of BH. During his deposition, Mr. Tardugno explained his understanding of the role of Mr. Lowe (whom he sometimes referred to as Gary) as follows:

> Q: When you signed the [escrow agreement], what was your understanding as to how or what role Mr. Lowe was to play in connection with his obligations as an escrow agent?
>
> A: Well. When I first met with Mr. Lowe and Mr. Gaudet, I was informed that Gary was the man to see. If you needed anything, Gary was the gentleman you needed to talk to.
>
> Q: Okay. What was your understanding of the role Mr. Lowe would play with respect to the escrow of titles?
>
> A: That he would be in charge of Birch Hollow operations.[4]

---

[2] Louise Gaudet, Mr. Gaudet's wife, is the owner and manager of BH. The parties have stipulated that she was not involved in the daily management of the company. Mr. Gaudet ran BH's operations and retained its attorneys and escrow agents. Stipulated Facts at ¶¶ 46-48.

[3] Mr. Tardugno was not present in court on the day of the trial. I offered to add a second day of trial so that BH could subpoena Mr. Tardugno to testify but BH chose to rest its case after calling Mr. Gaudet as its only witness and to rely on Mr. Tardugno's deposition transcript.

[4] Transcript of the July 8, 2011 deposition of Neil Tardugno at p. 34.

All the loan documents and escrow agreements contained provisions requiring any amendment or variation in the terms of any of the documents to be in a writing signed by all parties and stating explicitly that amendments or variations not conforming to these requirements would be unenforceable. There were never any written modifications to the loan documents or escrow agreements.

Mr. Tardugno testified at his deposition that sometime in late 2006 he had a conversation with Mr. Lowe as a result of which certain terms of the escrow agreements were changed. According to Mr. Tardugno's deposition testimony, when the economy began to sour, a time he remembered as sometime in the second half of 2006, the value of MAS's automobile inventory began to decline. Mr. Tardugno testified that at that time the "real dollar value" of the vehicles financed by BH was significantly below the amount financed. Mr. Tardugno stated that he discussed this with Mr. Lowe during their conversation and with Mr. Lowe's consent he caused MAS to begin selling cars for less than the amount required to pay BH according to the terms of its financing agreements, a situation referred to in the auto industry as selling "out of trust."[5] The parties agree that beginning in or about the second half of 2006 and in direct contravention of the stated terms of the loan documents, Mr. Lowe began releasing automobile titles from escrow to MAS even though Mr. Lowe did not receive full payment for each vehicle. As a consequence, MAS's automobile inventory was sold or disposed of and a substantial portion of BH's outstanding loan balance was left unpaid.

One of Mr. Lowe's duties was to regularly prepare and deliver to BH accountings of the status of MAS's automobile inventory. He did so in the form of spreadsheets in which he kept

---

[5] Transcript of the July 8, 2011 deposition of Neil Tardugno at pp. 23-24 and pp. 53-56.

4

track of each MAS automobile financed by BH. When a car was sold, Mr. Lowe would add to the spreadsheet the amount received by BH. In this way BH could monitor MAS' compliance with the financing agreements. When there was no dollar amount inserted on a spreadsheet next to a particular vehicle, it signaled to BH that the vehicle had not yet been sold and thus could be found on MAS' used car lot. Mr. Gaudet testified that the spreadsheets he received from Mr. Lowe showed nothing that would have caused him to conclude that vehicles were being sold out of trust. He testified that the spreadsheets he received from Mr. Lowe indicated that BH had been paid all amounts due and owing to it for each vehicle sold by MAS.

In late 2008, Mr. Gaudet discovered that the vehicles which the spreadsheets indicated were not yet sold and which he believed were subject to BH's security interest were no longer at MAS's dealership, in either Middleton, Massachusetts or Plaistow, New Hampshire, to which MAS had relocated without notifying BH. Mr. Gaudet visited both locations and discovered that the vehicles were gone. Mr. Gaudet then called Mr. Lowe, who admitted that he had released vehicle titles to Mr. Tardugno or MAS without receiving payment in full for the vehicles. At this point BH brought suit against MAS, Messrs. Tardugno and Lowe and others in the Middlesex County Superior Court Department of the Massachusetts Trial Court asserting claims for conversion and fraud and seeking money damages as a result of the losses it claimed to have incurred as a result of its dealings with the defendants.

On February 13, 2009, not long after BH initiated the state court lawsuit, Mr. Tardugno and his wife filed a joint petition for relief under chapter 7 of the Bankruptcy Code commencing the main case. On May 15, 2009, BH filed its complaint initiating this adversary proceeding. Shortly thereafter, BH filed a motion in the Tardugno's chapter 7 case seeking relief from the

5

automatic stay provisions of the Bankruptcy Code in order to proceed with its state court litigation. Mr. Tardugno opposed the motion arguing that before being put to the expense of litigating in state superior court, the dischargeability of BH's claim should be determined in this adversary proceeding. Finding that the determination of the dischargeability of BH's claim would involve consideration of many of the same issues raised in the state court matter, on June 5, 2009, I granted BH's motion to lift the stay and in an effort to avoid putting Mr. Tardugno to the expense in time and money of litigating in two courts at the same time, stayed this adversary proceeding pending conclusion of the state court action.

In the state court action, Mr. Tardugno was represented by three different attorneys at various times during the case. He filed an answer to BH's complaint and a motion to move the case onto the "average track" (as compared to the accelerated track). When BH filed a motion for summary judgment, he filed a response to the statement of uncontested facts filed by BH. Neither Mr. Tardugno nor his attorney of the moment appeared at the hearing on the summary judgment motion, however.   The superior court granted summary judgment in favor of BH. Its docket contains the following entry:

> 12/21/2011 Motion (P#52) After hearing on November 30, 2011 at which neither the defendant Tardugno nor his legal counsel appeared; after review of the plaintiff's [sic] for Summary Judgment on counts 3 and 4 of it's [sic] Amended Complaint against Defendant Tardugno[;] after review of the plaintiff's statement of material facts and supporting documents, and after review of the Plaintiff's memorandum of law in support of its motion on counts 3 and 4; and there being no filed opposition by defendant Tardugno, the plaintiff's motion for summary judgment on counts 3 and 4 of the amended complaint is ALLOWED.

The superior court held a hearing to assess damages and on June 28, 2102, entered judgment against Mr. Tardugno in the amount of $990,690.76, less any amount collected from co-defendant Lowe.    In relevant part the court's judgment states:

> As to Defendant Neil Tardugno as to the claims for breach of his fiduciary duties and guaranty [sic] to MAS' obligations, Judgment shall enter against said defendant for (sic) the amount of $990,690.76 subject to setoff by any amount paid by Lowe towards this amount.

On March 14, 2013, the superior court issued an execution against Mr. Tardugno in the amount of $1,533,001.91. The field of battle then shifted back to this court where the stay was lifted and the matter proceeded to trial.

## Conclusions of Law

**Burden of Proof**

As the party seeking to exclude its claim from discharge, BH bears the burden of proving by a preponderance of the evidence that its claim should be so excluded. *Palmacci v. Umpierrez,* 121 F.3d 781, 786–87 (1st Cir.1997). "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy, and, for that reason, the claimant must show that his claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)… The statutory requirements for a discharge are construed liberally in favor of the debtor and [t]he reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Id.* (internal citations and quotation marks omitted).

**Bankruptcy Code § 523(a)(2)(A)**

In count I of its complaint, BH alleges that Mr. Tardugno obtained financing from BH by misrepresentations, false pretenses and by actual fraud and thus his liability for amounts financed should be excepted from discharge under Bankruptcy Code § 523(a)(2)(A) which classifies as non-dischargeable a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud…" 11

7

U.S.C. § 523(a)(2)(A). The United States Court of Appeals for the First Circuit has offered a useful checklist for determining the applicability of this statute:

> The statutory language [of § 523(a)(2)(A)] does not remotely suggest that nondischargeability attaches to a claim other than one which arises as a direct result of the debtor's misrepresentations or malice. Thus, in order to establish that a debt is nondischargeable because obtained by "false pretenses, a false representation, or actual fraud," we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage. *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir.1997). Though the first two elements of the *Palmacci* test describe the conduct and scienter required to show fraudulent conduct generally, the last four embody the requirement that the claim of the creditor arguing nondischargeability in an adversary proceeding must arise as a direct result of the debtor's fraud.

*McCrory v. Spigel (In re Spigel),* 260 F.3d 27, 32 (1st Cir. 2001) (footnote omitted).

With respect to fraudulent conduct, a creditor must prove actual fraud, rather than fraud implied in law. *Palmacci*, 121 F.3d at 788. Although fraud cannot be implied in law, it may be inferred from the totality of the circumstances. *Palmacci*, 121 F.3d at 789. In *Old Rrepublic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 482 B.R. 15, 28 (Bankr. D. Mass. 2012) *aff'd*, CIV.A. 12-12414-DPW, 2013 WL 2436688 (D. Mass. June 3, 2013) *aff'd*, 737 F.3d 814 (1st Cir. 2013), Judge Frank J. Bailey noted that § 523(a)(2)(A)'s reference to false pretenses, a false representation or actual fraud establishes three separate standards, any one of which may be grounds for a finding of nondischargeability. He concluded that the difference between a false representation and false pretenses is that the latter involves "an implied misrepresentation or a false impression created by conduct of the debtor."[6] "[W]hen the circumstances imply a

---

[6] Some courts ignore any distinction that might be drawn among false pretenses, false representations and actual fraud. *See Mandalay Resort Group v. Miller (In re Miller)*, 310 B.R.

8

particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." *Levasseur*, 482 B.R. at 28.

BH's proof falls short of the mark with respect to the criteria for nondischargeability set forth in Bankruptcy Code § 523(a)(2)(A). The fact that Mr. Tardugno through MAS engaged in out of trust vehicle sales does not establish fraud. *See Mitsubishi Motor Sales of Caribbean, Inc. v. Seda Ortiz*, 418 B.R. 11 (D.P.R. 2009). Despite BH's insistence, the evidence presented does not show that Mr. Tardugno conspired with Mr. Lowe to defraud BH. As Mr. Gaudet testified, it was Mr. Gaudet who had the prior relationship with Mr. Lowe and it was BH which chose Mr. Lowe to act as escrow agent. Further, there is no evidence that Mr. Tardugno hid vehicles or diverted sales proceeds to benefit himself. His deposition testimony, which was admitted into evidence at the trial, was to the contrary. He testified that he believed Mr. Lowe, acting on behalf of BH, had agreed to his and MAS's selling automobile inventory for reduced prices. Mr. Lowe released the titles from escrow upon receipt of insufficient payment. Perhaps most damaging to BH's case is the absence of evidence that Mr. Tardugno attempted to conceal the out of trust vehicle sales. On the contrary, for each vehicle sold, Mr. Tardugno had to request the release of title from Mr. Lowe. It was Mr. Lowe who compiled the misleading spreadsheets given to BH. BH

---

185, 199-200 (Bankr. C.D. Cal. 2004) ("In using the phrase, 'false pretenses, a false representation, or actual fraud,' it is easy to conclude that Congress intended to specify three different grounds on which to deny the discharge of a debt…. In contrast, many of the reported § 523(a)(2)(A) decisions do not distinguish between false representations and false pretenses because it is difficult to state clearly how the two concepts differ. As one court noted, [t]he conceptual difficulty attending such a fine differentiation ... leads courts to typically ignore the negligible difference between the two phrases." (Internal citations and quotation marks omitted).

9

has failed to establish that Mr. Tardugno was aware that the spreadsheets which BH received from Mr. Lowe created a false impression as to the status of MAS' automobile inventory. Mr. Tardugno's deposition testimony was that while spreadsheets were provided by BH to MAS they were redacted to remove certain information such as loan balances, floor plan fees and deposit dates.[7] Mr. Tardugno's explanation that he had an agreement with Mr. Lowe, who he believed acted for BH, to sell cars for whatever prices he could get given the weakening economy is not implausible. True, all agreements entered into by the parties made it clear that without exception variations from terms had to be in writing, but this would hardly be the first time parties to a contract failed to abide by such requirements and agreed verbally or through their actions to changes in deal terms. It is conceded, for example, that BH and MAS simply ignored the provision of their financing agreement requiring vehicle inventory to be turned every 60 days. Remember, the issue here is not about the enforceability of oral modifications but whether Mr. Tardugno believed BH had agreed to them.

Having failed to establish actual fraud, a false representation or false pretenses, BH has failed to carry its burden that Mr. Tardugno's debt should be excepted from discharge under Bankruptcy Code § 523(a)(2)(A).

**Bankruptcy Code 523(a)(4)**

Bankruptcy Code § 523(a)(4) excepts from discharge a debt arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." BH rests count II of its complaint on the assertion that Mr. Tardugno was a fiduciary. BH claims, first, that because Mr. Lowe, as escrow agent under the escrow agreements, was a fiduciary and Mr. Tardugno was

---

[7] Transcript of the July 8, 2011 deposition of Neil Tardugno at pp 131-137.

a signatory of the escrow agreements, Mr. Tardugno was also a fiduciary. BH's logic is flawed. Not every party to an escrow agreement is a fiduciary. Mr. Tardugno was no more a fiduciary of BH under the escrow agreements than BH, also a signatory, was a fiduciary to him. Indeed the evidence established that Mr. Tardugno believed Mr. Lowe acted on behalf of BH.

BH's second reason for claiming that Mr. Tardugno was its fiduciary is because the superior court awarded judgment in favor of BH and against Mr. Tardugno "for breach of his fiduciary duties" and under principles of collateral estoppel Mr. Tardugno may not relitigate the issue here.

The doctrine of collateral estoppel, sometimes referred to as issue preclusion, prevents a party from relitigating "any factual or legal issue that was *actually* decided in previous litigation between the parties, whether on the same or different claim." *Grella v. Salem Five Cent. Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994) (internal citation and quotation marks omitted, emphasis in original). The doctrine applies in bankruptcy dischargeability proceedings. *Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In determining whether a party is collaterally estopped from relitigating an issue decided in a prior state court action, the bankruptcy court must look to that state's law of collateral estoppel.. *Spigel*, 260 F.3d at 33. Under Massachusetts law the doctrine of collateral estoppel applies to a subsequent litigation claim if: (1) there was a valid and final judgment on the merits in the prior litigation; (2) the party against whom estoppel is asserted was a party (or in privity with a party) in the prior litigation; (3) the issue in the prior litigation is identical to the issue in the current litigation; and (4) the issue in the prior litigation was essential to the earlier judgment. *Alba v. Raytheon Co.,* 441 Mass. 836, 841, 809 N.E.2d 516, 521 (2004) (citations omitted). A

fifth and overarching element is that the issue was "actually litigated" which has been defined to mean the issue was subject to an adversary presentation and consequent judgment that was not a product of the parties' consent and is a final decision on the merits." *Keystone Shipping Co. v. New England Power Co*., 109 F.3d 46, 52 (1st Cir. 1997) (internal citation and quotation marks omitted). In other words, the party who is to be estopped must have had a "full and fair opportunity to litigate the issue in the first action or [no] other circumstances justify affording him an opportunity to relitigate the issue." *Treglia v. MacDonald,* 430 Mass. 237, 717 N.E.2d 249, 253 (1999) (quoting *Martin v. Ring,* 401 Mass. 59, 514 N.E.2d 663 (1987)).

While I have doubts that the superior court default judgment against Mr. Tardugno achieves collateral estoppel effect according to the above standards, I need not decide the question because even if it did, that judgment would not result in a ruling of non-dischargeability under Bankruptcy Code § 523(a)(4) in this proceeding.

Federal law controls the definition of "fiduciary" under § 523(a)(4). *Kwiat v. Doucette*, 81 B.R. 184, 188 (D. Mass. 1987). The term "has been narrowly construed to apply only to relationships involving express or technical trusts, and not trusts that are imposed by law as a remedy….Accordingly, implied or constructive trusts, and trusts *ex maleficio* do not establish fiduciary relationships under the [Bankruptcy] Code." *M-R Sullivan Manufacturing Co. v. Sullivan (In re Sullivan)*, 217 B.R. 670, 675 (Bankr. D. Mass. 1998).

State law defines "the essential attributes of a trust relationship." *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 688 (B.A.P. 1st Cir. 2012). "The usual elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined *res, and an intent to create a trust relationship." Id.* at 687**.** In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 334, 55

S.Ct. 151, 79 L.Ed. 393 (1934), the United States Supreme Court concluded that documents creating a floor-plan financing agreement did not create an express trust or a fiduciary relationship and "the resulting obligation is not turned into one arising from a trust because the parties to one of the documents has chosen to speak of it as a trust." *Id*. A technical trust differs from an express trust in that the intention of the parties is not relevant. In a technical trust, fiduciary obligations such as the duty owed by a director to a corporation's shareholders are imposed on the parties by statute or common law. *Raso*, 482 B.R. at 688. "Where the basis for the existence of a technical trust is statutory, the statute must (1) define[ ] the trust res, (2) spell[ ] out the trustee's fiduciary duties, and (3) impose[ ] a trust prior to and without reference to the wrong that created the debt." *Id.* (Internal citation and quotation marks omitted).

The superior court's judgment is silent as to the nature of the fiduciary relationship between Mr. Tardugno and BH. There is nothing in the record of this proceeding that establishes either an express or technical trust relationship between Mr. Tardugno and BH. BH has offered no evidence to establish that Mr. Tardugno owed it a statutory or common law duty. Thus whatever fiduciary duty the superior court determined was breached by Mr. Tardugno, it was not the kind that supports a § 523(a)(4) exception to discharge and thus BH is not entitled to judgment under that statutory provision.

**Bankruptcy Code § 523(a)(6)**

To succeed on a claim of non-dischargeability under § 523(a)(6) a creditor must prove that its debt arose as a result of "willful and malicious injury" by the debtor. To prove that Mr. Tardugno's acts were willful, the first prong of the § 523(a)(6) test, BH must have demonstrated that Mr. Tardugno inflicted upon it a deliberate or intentional injury or that by his conduct there

13

was substantial certainty that injury would result. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 974, 140 L.Ed.2d 90 (1998). To prevail on the second prong of the test, that the injury be malicious, BH needed to prove that Mr. Tardugno inflicted injury upon it without justification or excuse. *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997). BH did not satisfy either test on the evidence submitted. The evidence plausibly established that Mr. Tardugno believed BH through Mr. Lowe concurred with his plan to sell automobile inventory at discounted prices in the face of the weakening economy. It also established that Mr. Tardugno believed that MAS' automobile inventory was declining in value and so by selling vehicles quickly he was preventing further losses for both MAS and BH. Finally, no evidence supported a conclusion that Mr. Tardugno secreted vehicles or sales proceeds for his own benefit. BH has failed to carry its burden under Bankruptcy Code 523(a)(6).

## Order

As BH has failed to demonstrate by a preponderance of the evidence that its debt should be excepted from Mr. Tardugno's bankruptcy discharge under subsections 2, 4 or 6 of Bankruptcy Code § 523(a), judgment shall enter for Mr. Tardugno on all counts of the complaint.

At Worcester, Massachusetts this 30th day of April, 2014.

By the Court,

_[signature]_

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:    Douglas E. Hausler, Esq.
                     Lampert, Hausler, & Rodman PC
                     Chelmsford, MA
                     for plaintiff, Birch Hollow, LLC

                     Ellen A. Wright, Esq.
                     Wright& Associates
                     Tewksbury, MA
                     for defendant, Neil Tardugno